DAVID DEERSON
Cal. Bar No. 322947
DDeerson@pacificlegal.org
Pacific Legal Foundation
3100 Clarendon Boulevard, Suite 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
Facsimile: (916) 419-7747

JEREMY TALCOTT
Cal. Bar No. 311490
JTalcott@pacificlegal.org
Pacific Legal Foundation
701 Kimberly Ave., Suite 200
Placentia, California 92870
Telephone: (916) 419-7111
Facsimile: (916) 419-7747

AUSTIN WAISANEN
Wyo. Bar No. 8-7023*
AWaisanen@pacificlegal.org
Pacific Legal Foundation
3100 Clarendon Boulevard, Suite 1000
Arlington, Virginia 22201
Telephone: (916) 419-7111
Facsimile: (916) 419-7747

*Attorneys for Plaintiff*
*pro hac vice application forthcoming

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| JOHN RUDA, SHAHRIAR ZARNEGAR, JORDAN KNAUER, and 3160 JOHNSON, LLC, | No. 2:26-cv-02283 |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| CITY OF SAN LUIS OBISPO, | |
| Defendant. | |

**INTRODUCTION**

1. Plaintiffs John Ruda, Shahriar "Rami" Zarnegar, and Jordan Knauer are three family friends who have known each other for decades. John is a chiropractor by trade, Rami an ophthalmologist, and Jordan a real estate agent. Despite their disparate professional interests, the three friends recently discovered an opportunity to work together to do well for themselves by doing good for their community.

2. The three formed an LLC to purchase property at 3160 Johnson Avenue, which contained a run-down uninhabitable home. They proceeded to subdivide the lot and create four new single-family dwellings, each with an attached accessory dwelling unit (ADU). Thanks to these efforts, San Luis Obispo will now have eight new habitable housing units where before there had been none.

3. California faces a severe housing crisis, "falling far short of meeting current and future housing demand." Cal. Gov't Code § 66310(e)–(f). Yet rather than embrace the efforts and can-do attitude of Plaintiffs, the City of San Luis Obispo (City) makes their work more difficult—and much more costly—by inverting a fundamental law of economics: more supply means lower prices. Turning that axiom on its head, the City reached the remarkable conclusion that its housing shortage is caused by building more homes.

4. Thus, it refuses to issue development permits until homebuilders like Plaintiffs—the very people working to resolve housing affordability issues by adding much-needed supply—either pay a fee into the City's affordable housing fund or set aside a certain percentage of units to be offered at economically infeasible rates. Under the City's Inclusionary Housing Policy (IH Policy), the City demanded that Plaintiffs pay nearly $100,000 into the City's housing fund or sell one of

the units at a little over half the cost of construction to the City's chosen buyers. It conditioned the Plaintiffs' building permits on these exactions.

5. As a matter of logic, the City cannot make housing more affordable by making it more expensive. As a matter of law, it cannot abuse its land-use permitting authority to take money or property from applicants in order to address problems that those applicants do not create. Under Supreme Court precedents in *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), *Dolan v. City of Tigard*, 512 U.S. 374 (1994), *Koontz v. St. Johns River Water Management District*, 570 U.S. 595 (2013), and *Sheetz v. County of El Dorado*, 601 U.S. 267 (2024), the City cannot force land-use permit applicants to give up money or other property as a condition of granting a permit unless the money or property demanded is designed to mitigate some public problem that the applied-for development would create.

6. This Complaint challenges the City's IH Policy, codified at San Luis Obispo Municipal Code (SLO Mun. Code) tit. 17, art. 8, ch. 17.138. Plaintiffs seek a declaration that the requirements of the IH Policy represent unconstitutional conditions both facially and as applied. They further seek a refund of the $98,900 in fees that they were forced to pay under the policy; an injunction prohibiting the City from imposing exactions under the Policy on developments done by Plaintiffs in the future; and an award of attorney fees and costs incurred in this action. Accordingly, Plaintiffs allege as follows:

## JURISDICTION

7. This suit is filed pursuant to 42 U.S.C. § 1331 (federal questions) as it arises under the Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343(a)(4) (civil rights) as it seeks redress of civil rights violations under 42 U.S.C. § 1983.

8. This suit also seeks a declaration of rights under the Declaratory Judgment Act, 28 U.S.C. § 2201.

9. Property owners may bring a Fifth Amendment claim in federal court under 42 U.S.C. § 1983 as soon as the government takes property without compensation. *Knick v. Twp. of Scott*, 588 U.S. 180, 202 (2019).

## VENUE

10. The property that is the subject of this action is located—and the civil rights violations alleged herein took place—in San Luis Obispo, California. Therefore, venue is proper in this judicial district.

## PARTIES

11. Plaintiffs John Ruda, Shahriar "Rami" Zarnegar, and Jordan Knauer are all individual citizens of the United States who are domiciled and reside in California. As the owners of 3160 Johnson, LLC, they are subject to the City's IH Policy.

12. Plaintiff 3160 Johnson, LLC is a Limited Liability Company incorporated in the State of California. Its principal address is 1317 Chorro Street, San Luis Obispo, CA 93401, and its principal agent is Jordan Knauer.

13. Defendant City of San Luis Obispo is a political subdivision of the State of California, the local governing authority in San Luis Obispo, and the party who promulgates and enforces the unconstitutional policies, customs, and practices alleged herein.

## LEGAL BACKGROUND

**The Takings Clause and Land Use Permit Exactions**

14. Under the Takings Clause of the Fifth Amendment to the United States Constitution, no government agency may take private property for a public use without paying just compensation. U.S. Const.

amends. V (Takings Clause), XIV (applying Takings Clause to state and local governments). As a corollary to this rule, a government agency imposing a land-use permit condition that requires the dedication of private property, including money, "must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Dolan*, 512 U.S. at 391; *see Koontz*, 570 U.S. at 595 (holding that monetary exactions are subject to the same requirement). Specifically, the agency must carry the burden of showing that the exaction bears an "essential nexus" and "rough proportionality" to the public impacts of the proposed project, lest the exaction be nothing more than an "out-and-out plan of extortion." *Nollan*, 483 U.S. at 837; *Dolan*, 512 U.S. at 387.

**San Luis Obispo's Inclusionary Housing Policy**

15. The City's IH Policy sets out a program of development fees, exactions, and other regulations imposed on new development. A true and correct copy of Chapter 17.138 of the San Luis Obispo Municipal Code is attached hereto as **Exhibit A**. This copy was downloaded on January 6, 2026, from https://tinyurl.com/2hs7ce73, which is linked to the City's official website at https://tinyurl.com/ybjbnedh (last accessed Feb. 17, 2026).

16. The policy applies to all residential development with limited exception. SLO Mun. Code §§ 17.138.040(A), .030(O). Each such project must either construct a certain number of "inclusionary units" (IUs) in proportion to the total number of units in the development, or else pay an in-lieu fee. *Id.* § 17.138.040(A).

17. An inclusionary unit is a unit which is set aside to be offered at below-market rates, either for rent or for sale, and which may only be

rented, purchased, or occupied by qualifying households as determined by the City. *Id.* § 17.138.090(A)–(B).

18. The IH Policy's requirements differ slightly depending on whether units are "ownership dwelling Units" or "rental dwelling units." Neither term is defined. On information and belief, they refer to whether the developer intends to sell the units or to maintain ownership and rent them to tenants.

19. For example, development projects proposing ownership units must set a larger portion of total units as IUs than projects proposing only rental units. *Id.* § 17.138.040(B)(1)–(2).

20. IUs are subject to several standards. For example, they must be: dispersed throughout the development; consistent with design of market rate units in the development; no less than seventy-five percent of the floor area of the average size of market rate units in the development; and constructed concurrently with market rate units. *Id.* § 17.138.050(A).

21. In lieu of providing IUs, developers may instead elect to pay a fee to the City. The fee rate is established by city council resolution, and fees are deposited into an "affordable housing fund" used to subsidize affordable housing "at the discretion of the [City] council." *Id.* § 17.138.060.

22. Project applicants are required to submit an "inclusionary housing plan" prior to approval describing the measures which the applicant will take to satisfy the IH Policy. *Id.* § 17.138.070.

23. Applicants who satisfy the ordinance by providing IUs must also complete and sign an "affordable housing agreement." The "agreement" must be in the form provided by the City, and must be recorded as a deed restriction on the lots subject to affordability

requirements. The deed restriction runs with the land and is binding on all future owners and successors in interest. Per the IH Policy, the agreement lasts for the "longest period allowed or required by state law, but not less than forty-five years for ownership and fifty-five years for rental." *Id.* § 17.138.080(B).

24. IUs may only be rented, purchased, or occupied by households who meet the income level associated with the IU. For-sale IUs must be owner-occupied for the entire term of the affordable housing agreement. *Id.* § 17.138.090.

25. If the purchaser of an IU later experiences an increase in income and rises above the extremely low, very low, low, or moderate income categories, that purchaser would no longer be eligible to occupy the home. SLO Mun. Code § 17.138.090(A).

26. The City must screen prospective renters or buyers of affordable units. Occupants are selected by a public process; private selection of individuals by project owners is not permitted. *Id.* § 17.138.090.

**The Commercial Linkage Fee and the Fee Schedules**

27. A separate policy, codified at Chapter 4.60 of the SLO Mun. Code, sets out a program of "commercial linkage fees."

28. The commercial linkage fee policy is not challenged here. However, it is useful as context in understanding the City's inclusionary housing program generally.

29. For example, both policies are referenced and described on the "Inclusionary Housing Requirements" page hosted on the City's official website, at https://tinyurl.com/ysafhzed (last accessed Feb. 17, 2026).

30. By necessity, commercial development cannot satisfy inclusionary housing requirements by the dedication of IUs. Rather, all

new construction commercial development projects—with limited exceptions including the City's own construction projects—must pay a "linkage fee" at rates to be set by City Council resolution.

31. For the 2025–2026 fiscal year, the City Council has set the current in-lieu fee rates for residential development under the IH Policy at $26.73 per square foot of habitable space on for-sale projects and $21.42 per square foot of habitable space on for-rent projects. The 2025–2026 fee schedule is available from the City's official website at https://tinyurl.com/b9dr4sme (last accessed Feb. 17, 2026). Inclusionary Housing In-Lieu Fees are listed at items 43–46 of the schedule.

32. For the same period, the City Council has set the commercial linkage fee at $6.42 per square foot for office, service, hotel, and retail uses, and $5.35 per square foot for industrial and institutional uses.

33. These fees are updated annually on July 1st.

**Justifications for the IH Policy**

34. By its own terms, the IH Policy's purpose is threefold. First, it seeks "to promote the public welfare by increasing the production and availability of affordable housing units." Second, it seeks to "establish an inclusionary housing requirement which implements general plan policies guiding land use and housing development." Third, it seeks "to ensure that affordable housing units established pursuant to the [IH Policy] are located in a manner that provides for their integration with market rate units." SLO Mun. Code § 17.138.010.

35. The "Inclusionary Housing Requirements" page on the City's official website notes that inclusionary housing requirements are "[o]ne of the tools to increase the supply of affordable housing in SLO!" The page is available at https://tinyurl.com/bdfbpacj (last accessed Feb. 17, 2026).

36.   According to a City Council Agenda Report dated August 16, 2022, and relating to the adoption of the most recent version of the IH Policy, Ordinance No. 1719, the IH Policy is necessary to "help achieve quantified objectives related to affordable housing." The report is linked to the City's official website and is available at https://tinyurl.com/29rvhw67 (last accessed Feb. 17, 2026).

37.   According to a 2020 Nexus Study commissioned by the City and performed by the consulting firm David Paul Rosen & Associates, "the basis for the [in-lieu] fee is that [new residential and non-residential] development has a deleterious impact by increasing employment, which also increases the demand for housing for the added employees. Since the private for-profit housing market, with no public assistance, has not demonstrated the ability to meet the housing needs of lower-earning employees, a nexus fee is justified to help create that housing." City of San Luis Obispo, *Affordable Housing Nexus Study*, 1 (Feb. 12, 2020) (prepared by David Paul Rosen & Associates), https://tinyurl.com/4b222ptp.

38.   The Nexus Study notes that non-residential development, "such as retail/services, office and industrial uses," have a "direct employment impact," while residential development has only "an indirect impact on employment, as household expenditures on goods and services are linked to the employment necessary to produce those goods and services." *Id.*

39.   The Nexus Study's nexus analysis begins by estimating the sale or rental price of a "prototypical residential subdivision or apartment complex and moves through a series of linkages to the incomes of the households that purchase or rent the units, the annual expenditures of those households on goods and services, the jobs associated with the

delivery of these goods and services, the income of the workers performing those jobs, the household income of those worker households, and finally to the affordability level of the housing needed by those worker households." *Id.* at 5. It thereby purports to determine the extent to which new development creates unmet demand for affordable housing.

40.    The City also commissioned a Feasibility Analysis, completed in February 2022, which considered that the maximum "allowable" fees calculated by the Nexus Study would render most, if not all, development financially infeasible. City of San Luis Obispo, *Recommendations for San Luis Obispo's Proposed Affordable Housing Fees Inclusionary Requirements, In-lieu Fees and Commercial Linkage Fees; EPS #191142*, 1 (Feb. 2, 2022) (prepared by Economic & Planning Systems, Inc.), https://tinyurl.com/2jenja3j.

41.    The Feasibility Analysis assumes that a fifteen percent profit margin is required for a development project to be financially feasible. It recommends that the IH Policy impose requirements that are less onerous than the Nexus Study purports to justify in order to ensure that development does not become infeasible. In particular, it recommended that ten percent of for-sale and six percent of for-rent units be set aside as IUs, or else that developers pay an in-lieu fee of $25 per square foot on for-sale residential projects or $20 per square foot on for-rent residential projects.

## FACTUAL ALLEGATIONS

42.    John Ruda and Rami Zarnegar have been close friends for decades. Jordan Knauer is the son of another of their longtime friends.

43.    In 2023, Mr. Knauer, who works as a real estate agent, approached Mr. Ruda and Mr. Zarnegar with an exciting opportunity.

44. The lot at 3160 Johnson Avenue in San Luis Obispo contained a decrepit house in uninhabitable condition.

45. The three friends would form an LLC and purchase the lot. Then, utilizing local policies which comport with statewide initiatives such as SB9's lot split mechanism and the state's ADU law, they would subdivide the property into four separate lots and construct a single-family residence plus an ADU on each lot.

46. In doing so, they would create eight new, habitable residences where none previously existed.

47. At first, the process went smoothly. They formed 3160 Johnson, LLC, acquired a deed to the lot, and proceeded with their subdivision plans with little trouble.

48. When it came time to apply for permits to construct the new residences, however, they faced a troubling obstacle: the City's IH Policy.

49. Under the IH Policy, the City informed them that they would either have to set aside one of the four primary units as an IU to be deed-restricted at below-market prices, or else pay in-lieu fees totaling $98,900.

50. To satisfy the IU route, the restricted unit would have to be limited to a sale price of $450,000.

51. Each unit, including its corresponding ADU, cost approximately $1,325,000 to construct.

52. It is not clear how the price restriction component of the IU option would be implemented on a primary unit that includes an attached ADU, given that ADUs may not ordinarily be sold separately from primary units. *See* Cal. Gov't Code § 66314(d)(1); SLO Mun. Code § 17.86.020(B)(2)(b) (prohibiting subdivision to separate primary unit from ADU).

53. On information and belief, the $450,000 price restriction would apply to the entire parcel consisting of both a primary unit and an attached ADU.

54. In short, the IU route would require Plaintiffs to take a loss of nearly a million dollars, in addition to eliminating their ability to freely alienate the property by choosing their own sale price and selecting their own buyers.

55. Plaintiffs protested the imposition of both conditions verbally to City staff, who did not relent.

56. In September of 2024, Plaintiffs opted to pay the in-lieu fees and proceed with construction. A true and correct copy of the receipt reflecting payment of the fees is attached hereto as **Exhibit B**.

57. In August 2025, Plaintiffs heard of new developments in the law, such as *Sheetz v. County of El Dorado*, 601 U.S. 267 (2024). They also heard that the City of Healdsburg, California, had recently settled a case alleging that a policy similar to the IH Policy violated the Constitution.

58. Plaintiffs therefore contacted City officials seeking a refund, pointing out that their project—which adds to the City's housing supply—does not negatively impact affordable housing.

59. On August 21, 2025, Director of Community Development Timothea Tway responded that "[t]he City has reviewed the project and the authority [Plaintiffs] have cited and finds that the fee was properly administered in accordance with our codes and policies and declines to issue a refund." A true and correct copy of this email correspondence is attached hereto as **Exhibit C**.

60. The City presented Plaintiffs with two bad choices: give up their property rights by acquiescing to a deed-restricted IU, or pay nearly $100,000. Of course, there was an unspoken third option: don't build at

all. But the government may not constitutionally force a person to choose between a building permit and the Fifth Amendment right to just compensation for property taken.

## CLAIMS FOR RELIEF

## Unconstitutional Exaction

## 42 U.S.C. § 1983, 28 U.S.C. § 2201

## Facial and As-Applied

61.   All preceding allegations of this Complaint are incorporated by reference in this section as though fully set forth herein.

62.   The Civil Rights Act of 1871, 42 U.S.C. § 1983, provides that a person "shall be liable to the party injured" when, acting under the authority of a statute or ordinance, he or she deprives an individual of a right secured by the U.S. Constitution.

63.   The City is a "person" within the meaning of that term in 42 U.S.C. § 1983.

64.   The City acted under color of the IH Policy when it conditioned permit approval for Plaintiffs' project on a requirement that they either set aside one of the units as an IU or else pay an in-lieu fee.

65.   The City has an established policy or custom of applying the IH Policy to exact property interests for the purpose of promoting affordable housing from permit applicants seeking to create housing units.

66.   Plaintiffs are all citizens of the United States and/or persons within the jurisdiction thereof within the meaning of those terms in 42 U.S.C. § 1983.

67.   Plaintiffs all possess rights, privileges, and immunities secured by the Constitution and laws of the United States, including, but not limited to:

a. The right, privilege, or immunity to build on their own property, even if subject to the City's legitimate permitting requirements. *Nollan*, 483 U.S. at 834 n.3.

b. The right, privilege, or immunity to sell one's property to the person of one's choosing and at a price of one's choosing. *See Buchanan v. Warley*, 245 U.S. 60, 80–82 (1917); *Old Dearborn Distrib. Co. v. Seagram Distillers Corp.*, 299 U.S. 183, 191–92 (1936).

c. The right, privilege, or immunity not to have their private property taken by the City for public use without just compensation. U.S. Const. amends. V, XIV.

d. The right, privilege, or immunity to be free of deprivations of their property by the City without due process of law. U.S. Const. amend. XIV.

e. The right, privilege, or immunity not to be forced by the City to forgo one constitutional right in order to enjoy another.

f. The right, privilege, or immunity not to comply with the IH Policy unless and until the City makes some sort of individualized determination that the required dedication is related both in nature and extent to the impact of their proposed development. *Dolan*, 512 U.S. at 391.

68. The doctrine of unconstitutional conditions, as set out by *Nollan*, *Dolan*, *Koontz*, and *Sheetz*, is a federal doctrine designed to enforce the primacy of the Fifth and Fourteenth Amendments to the U.S. Constitution against state and local governments in the land-use permitting context. As such, a violation of the doctrine of unconstitutional conditions is actionable under 42 U.S.C. § 1983.

69. The City imposed unconstitutional conditions on Plaintiffs' development project, and it routinely imposes unconstitutional conditions on residential development by others under the IH Policy.

70. The IH Policy's in-lieu fee option demands property in the form of money linked to a specific, identifiable property interest—*i.e.*, the specific parcel(s) of real property for which development permits are sought.

71. The IH Policy's IU option demands property in the form of dedications of several protected property interests, including (1) a financial interest in the affected unit; (2) the right of free alienation; (3) the right to exclude; (4) the right to sell or rent property at a fair market price; and (5) a servitude in the form of a perpetual deed restriction or restrictive covenant.

72. Moreover, the demand that a unit which cost $1,325,000 to construct be restricted to a sale price of only $450,000 denies Plaintiffs a fair and reasonable return on their property and is confiscatory.

73. Under the Doctrine of Unconstitutional Conditions, the government may demand property or money as a condition of approving a land-use permit only if:

    a. The property is needed to directly mitigate a public impact that would be directly caused by the development (the "essential nexus" test); and

    b. The amount of property is roughly proportionate in magnitude to the public impact(s) of the development (the "rough proportionality" test).

74. Both the essential nexus test and the rough proportionality test require heightened constitutional scrutiny.

75.    To meet its burden under these tests, the government must make "some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Dolan*, 512 U.S. at 391.

76.    The IH Policy fails these constitutional standards with respect to residential development, both facially and as applied, because new residential development, including Plaintiffs' project at issue in this suit:

a.    Neither creates nor contributes to the need for affordable housing;

b.    Does not cause anybody to be unable to afford housing; and

c.    Alleviates housing affordability problems by creating new housing.

77.    Because new residential development categorically does not have a negative public impact on housing affordability, there is no set of circumstances in which the IH Policy could satisfy *Nolan* and *Dolan*.

78.    Although the IH Policy is supported by a Nexus Study, that Nexus Study is insufficient to justify the policy for several reasons.

a.    It fails to account for the downward pressure that new supply puts on pricing;

b.    It fails to account for the "filtering" effect of new housing supply, by which existing units are freed up by new units, and by which new units become more affordable over time;

c.    It fails to establish the causal relationship between new residential development and increased workforce housing demands on which it relies; and

d.    It cannot explain why new commercial and industrial development is subject to lower fees than new residential

---

Complaint                                    16                          No. 2:26-cv-02283

development, despite the fact that commercial and industrial development is more directly related to increased workforce housing demands.

79. Plaintiffs did not have, and the City did not provide, any other lawful alternative to the conditions imposed by the IH Policy.

80. Legal remedies, such as monetary damages, are inadequate and insufficient to restore Plaintiffs' constitutional right to be free from the challenged conditions.

81. Plaintiffs are entitled to equitable relief as allowed by 42 U.S.C. § 1983, and they are additionally entitled to declaratory relief under 28 U.S.C. § 2201.

## RELIEF SOUGHT

WHERFORE, Plaintiffs respectfully request that this Court grant the following relief:

A. A judgment that the Inclusionary Housing Policy violates the doctrine of unconstitutional conditions both facially and as applied to Plaintiffs; and that Plaintiffs suffered a violation of their civil rights when the City conditioned approval of their projects on forfeiture of their right to just compensation for property taken;

B. Equitable relief in the form of an injunction prohibiting the City from enforcing the Inclusionary Housing Policy against Plaintiffs, and an Order directing the City to refund the fees paid under the Policy with interest;

C. An award of reasonable attorneys' fees for bringing and maintaining this action under 42 U.S.C. § 1988;

D. An award of costs of suit pursuant to Fed. R. Civ. P. 54(d); and

E. Any other relief that the Court deems just and proper under the circumstances.

DATED: March 4, 2026.

Respectfully submitted,

DAVID DEERSON
JEREMY TALCOTT
AUSTIN WAISANEN*
PACIFIC LEGAL FOUNDATION

By: /s/ DAVID DEERSON
DAVID DEERSON

*Attorneys for Plaintiffs*
Email: DDeerson@pacificlegal.org
*pro hac vice application forthcoming